J-A24030-25          2026 PA Super 9

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANGEL LUIS ADAMES | : | No. 310 MDA 2025 |

Appeal from the Order Entered February 5, 2025
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0002761-2024

BEFORE: DUBOW, J., KUNSELMAN, J., and BECK, J.

OPINION BY DUBOW, J.:                    **FILED: JANUARY 14, 2026**

The Commonwealth appeals from the order entered in the Berks County Court of Common Pleas on February 5, 2025, denying its Motion in Support of Medication Over Objection.[1]  It contends that the court erred in concluding that it did not present sufficient evidence to satisfy the factors outlined in ***U.S. v. Sell***, 539 U.S. 166 (2003), to support its request to involuntarily medicate Angel Luis Adames ("Appellee") so as to render him competent to stand trial. Following our review,  we are constrained to affirm.

We glean the relevant factual and procedural history from the certified record.  Appellee lived in an apartment in Spring Township that was on the second floor of three-unit apartment building.  Gregory S. Crammer rented the first floor unit, from which Mr. Crammer ran his business.  Over time,

---

[1] An order denying a state's motion to compel psychotropic medication is immediately appealable as a collateral order. ***Commonwealth v. Sam***, 952 A.2d 565, 573 n. 10 (Pa. 2008).

Appellee developed a belief that Mr. Crammer was a terrorist and, on the evening of June 24, 2024, he decided to kill him. Accordingly, Appellee broke into the building's basement holding his semi-automatic handgun, forced his way through the interior door leading into the first floor, and waited in Mr. Crammer's bathroom. When Mr. Crammer came to work the next morning, Appellee shot and killed him. Appellee then called 911 and reported that he had shot Mr. Crammer five times.

On June 28, 2024, the Commonwealth filed a criminal complaint charging Appellee with murder, aggravated assault, and burglary. Appellee subsequently underwent a psychiatric evaluation with Dr. Larry A. Rotenberg.

On September 10, 2024, at Appellee's formal arraignment, the court entered an order finding Appellee incompetent to stand trial based on the psychiatric evaluation and report of Dr. Rotenberg. Pursuant to 50 P.S. § 7402(b) of the Mental Health Procedures Act ("MHPA"), discussed *infra*, the court committed Appellee to Norristown State Hospital for involuntary inpatient treatment for 60 days, beginning when he was transferred from Berks County jail to the hospital. Prison officials transported Appellee on October 15, 2024. The court scheduled a status hearing for January 9, 2025.

In December 2024, the hospital sent a letter to the court stating that Appellee was incompetent to stand trial but requesting that the court order the involuntary administration of medication over Appellee's objections "for the purpose of restoring competency." Tr. Ct. Op., 4/16/25, at 1. The Commonwealth filed a Motion in Support of Medication Over Objection on

January 9, 2025. The Commonwealth did not attach the hospital's letter to its motion and the letter is not in the certified record.

The court heard evidence on the motion at the January 9, 2025 status hearing. After the parties stipulated that Appellee was incompetent to stand trial, the Commonwealth presented testimony from one of the police officers who had responded to Appellee's 911 call, and the court admitted the criminal complaint into the record.

The court then qualified Dr. Rocio Nell-Badra ("Dr. Nell"), Appellee's treating psychiatrist at Norristown State Hospital, as an expert in forensic psychiatry.[2] Dr. Nell testified that she performed Appellee's initial intake evaluation and that she observes him every day more than once a day, including at the daily morning group meetings when he chooses to attend. She opined that, based on her evaluation, treatment, and experience as a psychiatrist, Appellee suffers from a delusional disorder with paranoid ideation.

Dr. Nell explained that Appellee clearly described the development of his fixation on Mr. Crammer as a terrorist that became the focus of his thinking

---

[2] Dr. Nell has over fifty years' experience in the medical field and became board-certified in psychiatry in 1995, and board-certified in forensic psychiatry in 2007. She has worked at Norristown State Hospital, where she served as both the Director of Admission and Medical Director over a 12-year period, then at the Mongomery County Emergency Service ("MCES") as a psychiatrist for 32 years, followed by 11 years at the county jail where she conducted over 2,500 criminal evaluations. She then returned to the forensic unit at Norristown State Hospital where she has served as a psychiatrist for the past 8 years. N.T. Hr'g, 1/9/25, at 10-12.

and his life which he believes justified his actions in killing Mr. Crammer. She further testified that when she challenged Appellee on his distorted thoughts, he incorporated her into his delusional system and now considers her and the other medical staff to be terrorists. Dr. Nell opined that Appellee's paranoid ideation "makes him extremely dangerous." N.T. Hr'g, 1/9/25, at 14.

As an example, Dr. Nell testified that just a few days before the hearing, Appellee tried to incite a riot at the morning group meeting based on his paranoid beliefs that the medical staff and anyone else who disagrees with him is an enemy. She also testified that she "stopped that." She also stated that when she mentioned the upcoming hearing to Appellee, he told her "he didn't need any problem here." *Id*. When she responded to him by referencing the riot he tried to start on the unit, she testified that "he readily admitted to it and said that was totally justified because you are a terrorist. That's his frame of mind. That's his thinking. . . [and t]hat makes him extremely dangerous." *Id.*

She further testified that she has had him on constant "vigil observation" since his attempt to cause a riot because she believes he "is capable of planning things discreetly" and that she has been in fear for her and some of her staff members' lives. *Id*. She noted, however, that "the people that he gets along with are providing the supervision and so far we have not had a riot." *Id.* at 14-15.

Dr. Nell further testified that she prescribed Zyprexa, an anti-psychotic medication, in an attempt to treat Appellee's delusional disorder, but Appellee

refuses to take it. She opined that without medication Appellee's likelihood of successful treatment of his mental health disorder is "extremely poor, guarded." *Id.* at 15. She also opined that Zyprexa and other anti-psychotic medications have been successful in treating individuals suffering delusional disorders; however, she also opined that some paranoid delusions are more difficult to treat "because of a strong component of narcissism and self-centeredness" supporting "rigid ideation," which she "believe[s] is a factor here." *Id*. at 16. She stated

> So the idea is to start with one antipsychotic, see the effect that it has, and then match with other medications, other antipsychotics or mood stabilizers until we get the ultimate result. So following that plan[,] the prognosis is much better if treated but is not an absolute guarantee it would be effective.

*Id*.

Dr. Nell also testified that it is general practice to find the right medication for each individual patient and make adjustments to "clear the mind of the patient" so he "become[s] able to be in reality." *Id*. at 17-18. She opined that if treatment of his mental illness becomes successful with appropriate medication and Appellee becomes competent to stand trial, the medication would not interfere with his ability to aid in the defense of his case. *Id*. at 17. Of most significance, however, the ADA did not ask Dr. Nell and she did not opine that the medication was substantially likely to render him competent to stand trial.

Dr. Nell also testified that there are no less intrusive alternative methods to treat Appellee's mental illness and that the medication she has prescribed for him is in his best interest because, as with all patients suffering paranoid delusions, mental illness must to be treated, "[e]ven if the situation that they are going to face [is] an unpleasant one[.]" *Id*. at 19  She concluded that Appellee "is a severe risk to others, not to himself" because the "danger and delusions are directed to others." *Id*. at 22-23.

Following argument, the trial court took the matter under advisement. On February 5, 2025, the court entered an order denying the Commonwealth's motion, concluding that the Commonwealth failed to meet the *Sell* requirements necessary to overcome Appellee's right to refuse medication because Dr. Nell's testimony could not support a finding that the medication was "'substantially likely to render the defendant competent to stand trial.'" Order, 2/5/25, at ¶1.

The Commonwealth filed a motion to reconsider, asserting that it presented sufficient evidence to involuntarily medicate Appellee because he presents a danger to others. On February 24, 2025, the court summarily denied the Commonwealth's motion for reconsideration.

The Commonwealth appealed, raising the following issues for our review:

A. Did the trial court err in denying the Commonwealth's motion in support of medication over objection as the involuntary medication of [Appellee] over his objection was necessary to become competent to stand trial?

B. Did the trial court err in denying the Commonwealth's motion in support of medication over objection as the involuntary medication of [Appellee] over his objections was necessary to treat him as he is a danger to himself or others?

Appellant's Br. at 4.

In its first issue, the Commonwealth argues that it presented sufficient evidence to permit the involuntary administration of medication to render Appellee competent to stand trial. *Id*. at 15. We review sufficiency challenges under a *de novo* standard of review while viewing the evidence in the light most favorable to Appellee. **Commonwealth v. Chambers**, 188 A.3d 400, 409 (Pa. 2018).

The involuntary medication of a defendant implicates a constitutionally-protected liberty interest. **Sell**, 539 U.S. at 178; **see also Sam**, 952 A.2d at 585 (acknowledging that both the 4th Amendment of the U.S. Constitution and Article 1, Section 8 of the Pennsylvania Constitution provide the right to be free from "'unreasonable' intrusions" such as involuntary medication). Accordingly, the Commonwealth carries the burden to prove by clear and convincing evidence that the governmental interest in bringing a defendant to trial overrides this constitutionally protected liberty interest. **See In re Hancock**, 719 A.2d 1053, 1057-58 (Pa. Super. 1998) (in the context of the Mental Health Procedures Act ("MHPA"), applying a clear and convincing standard of proof to "help balance the need to provide mental health treatment against the individual's rights by providing necessary treatment for persons who are mentally ill.").

In **Sell**, **supra**, the U.S. Supreme Court provided a framework for courts to apply when presented with a request to compel the involuntary administration of medication to a mentally ill defendant to render the defendant competent to stand trial for serious crimes. 539 U.S. at 169.

> The Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is [1] medically appropriate, [2] is substantially unlikely to have side effects that may undermine the fairness of the trial, [3] taking account of less intrusive alternatives and [4] is necessary significantly to further important governmental trial-related interests.

**Id.** at 179 (citing **Washington v. Harper**, 494 U.S. 210 (1990),[3] and **Riggins v. Nevada**, 504 U.S. 127 (1992)).

The first element of the **Sell** test is for the court to determine if there is an "important governmental interest" that overrides the individual's liberty interests. **Sell**, 539 U.S. at 180. The Court broadly defined the government's interest as protecting society from dangerous criminals as well as its need to provide expedient justice in a fair trial. **Id**. The Commonwealth has met this requirement.

---

[3] In **Harper**, discussed **infra**, a state prison administered antipsychotic medication to a severely mentally ill prisoner against his will and the prisoner filed a civil rights action, claiming, *inter alia*, that the prison's failure to provide a judicial hearing before administering the medication violated the Due Process, Equal Protection, and Free Speech clauses of the U.S. Constitution. The U.S. Supreme Court determined that the prison did not violate Harper's constitutional rights because it followed state policy and procedures that adequately protected his civil rights.

With respect to the second prong, **Sell** requires courts to find that "involuntary medication will significantly further those concomitant [governmental] interests." **Id**. at 181 (emphasis omitted). The **Sell** court found that to satisfy this second prong, a court "must find that administration of the drugs is *substantially likely* to render the defendant competent to stand trial." **Id.** (emphasis added). Competency to stand trial "involves consideration of such matters as whether, once medicated, the inmate will be able to communicate with counsel, react to trial developments, and express emotions." **Sam**, 952 A.2d at 574 n.12.

In Appellee's case, there is no dispute that the Commonwealth's interest in bringing Appellee to trial for the serious and violent crime of pre-meditated murder is important for the protection of society and to provide justice for the victim's family. With respect to the second **Sell** factor, however, the trial court found that the Commonwealth did not establish that the involuntary administration of medication was "substantially likely to render [Appellee] competent to stand trial." Tr. Ct. Op., 4/16/25 at 5; **see Sell**, 539 U.S. at 181.

Based on our *de novo* review, we are constrained to agree with the trial court that the Commonwealth failed to present sufficient evidence to establish that involuntarily medicating Appellee was substantially likely to render him competent to stand trial. The Commonwealth failed to ask the question directly, and Dr. Nell merely opined that Appellee's *prognosis* is better with

psychotropic treatment and that the medication would not interfere with his ability to aid in his defense. She did not specifically testify that *once medicated*, Appellant would be able to "communicate with counsel, react to trial developments, and express emotions." **Sam**, 952 A.2d at 574 n.12. In other words, she did not conclude that there was a "substantial likelihood" that the involuntary administration of medication would render Appellee competent to stand trial. Accordingly, we are constrained to conclude the Commonwealth failed to provide sufficient evidence to satisfy the second **Sell** factor and the trial court properly denied the motion.

In its second issue, the Commonwealth argues that the court erred in denying its motion to reconsider by failing to find that "due to the dangerousness of [Appellee's] delusion," alternate grounds exist to compel his involuntary medication. Appellant's Br. at 20-21. The Commonwealth relies on the **Sell** court's observation that "a court need not consider whether to allow forced medication for [purposes of rendering a defendant competent to stand trial], if forced medication is warranted for a *different* purpose, such as the purposes set out in **Harper** related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." **Id**. at 19-20 (quoting **Sell** 539 U.S. at 181-82). The Commonwealth notes that "[w]hile at the time of the hearing [Appellee] had not yet become aggressive, Dr.Nell[] opined that [Appellee] was 'extremely dangerous' and he posed a 'severe risk' to others. In fact, she

feared for her life and the safety of her personnel." Appellant's Br. at 22.[4]

Stated another way, the Commonwealth argues that it presented sufficient evidence to establish that Appellee's mental illness is likely to cause harm if not treated with involuntary medication.

As an initial matter, we address whether the Commonwealth preserved this issue for our review. Appellee argues that the Commonwealth waived appellate review of this issue because its Motion in Support of Medication Over Objection referenced only the *Sell* factors as a basis to order involuntary medication and did not mention Appellee's dangerousness as a basis for seeking involuntary medication. Appellee's Br. at 23-24. Based on our review of the certified record and *Sell*, we reject Appellee's request that we find the issue waived. The Commonwealth presented evidence to the trial court at the hearing on the motion that Appellee posed a danger to others; the *Sell* opinion, in referencing *Harper*, acknowledges that dangerousness caused by mental illness may be a ground for administering involuntary medication. Accordingly, since the trial court had the opportunity to consider Dr. Nell's testimony that Appellee presented a danger to others, and the Commonwealth asked the court to reconsider its order in light of that evidence, we conclude

---

[4] The Commonwealth also broadly asserts, without citation to the notes of testimony, that Dr. Nell "was clear that no other treatment was available to [Appellee] other than medication." *Id*. at 21. Our review of the notes of testimony reveal that other treatment options, such as cognitive behavioral therapy and other non-pharmacological therapies, were never raised or discussed during the hearing.

the Commonwealth preserved the issue for appellate review. We also conclude, however, that the issue garners no relief.[5]

The **Harper** court addressed only whether a state's procedures which allow for the involuntary medication of a dangerous mentally ill prisoner protect that individual's rights to substantive and procedural due process. 494 U.S. 213. In referencing **Harper**, the Commonwealth implicitly acknowledges that there are due process requirements that must be met before confined individuals whose mental illness presents a danger to himself or others may be involuntarily medicated. In Pennsylvania, our legislature has provided those requirements in the MHPA, so the issue before us is whether the Commonwealth has complied with those requirements.

In this case, the trial court ordered that Appellee be held in Norristown State Hospital pursuant to Section 7402(b) of the MHPA after concluding "with reasonabl[e] certain[ty] that involuntary commitment will provide the

---

[5] The trial court summarily denied the motion for reconsideration without providing its reasons for doing so. In its Rule 1925(a) Opinion, it observed that the Commonwealth's argument "is contradicted by its expert witness, who testified that most patients are treated under **Harper** and that hospital staff only request a **Sell** hearing when a patient does not present as overtly aggressive." Tr. Ct. Op., at 6-7. The court's comment does not address the issue of whether the court could have concluded Appellee's dangerousness allowed it to order involuntarily medication on that basis alone. We, however, "are not limited by the trial court's rationale and may affirm its decision on any basis" that is apparent from the record. **Commonwealth v. Hunter**, 60 A.3d 156, 162 n.18 (Pa. Super. 2013).

Defendant with the capacity to stand trial."  Order,  9/10/24; 50 P.S. § 7402(b).

The MHPA also provides, however, that "[w]henever a person who is charged with crime, or who is undergoing sentence, is or becomes severely mentally disabled, proceedings may be instituted for examination and treatment **under the civil provisions of this act in the same manner as if he were not so charged or sentenced.**"  50 P.S. § 7401(a) (emphasis added).  The civil provisions of the MHPA that are applicable are set forth in Sections 7301-7306.

Relevant to this appeal, Section 7304(b)(1) directs that to obtain court-ordered involuntary treatment, the county administrator or director of the hospital facility must petition the court of common pleas after following the procedures provided in Section 7304(b)(2).  Section 7304(b)(2) provides the details that the county administrator or facility director must include in its petition, instructs how a petition must be presented to the court, and mandates when the court must hold a hearing after the petition is filed.  *Id*. at Sections 7304(b)(2) – (5).

Here, the Commonwealth failed to provide any evidence to the trial court demonstrating that the hospital director or the county administrator followed the procedures mandated by the legislature.  Although the trial court referenced a "letter" it received from the hospital, the Commonwealth did not seek to admit that letter into the record and, as noted above, the letter is not

in the certified record. Moreover, the Commonwealth did not reference any Section 7401(b)(1) petition it submitted to support its Motion in Support of Medication Over Objection or its Motion for Reconsideration. Accordingly, we conclude the court did not err in denying the Commonwealth's motion for reconsideration.

We emphasize that we are not minimizing, and in fact are troubled by, the risk that the defendant may pose to the staff at Norristown Hospital if he is not medicated. The MHPA, however, properly imposes administrative requirements before a court may order that a hospital involuntarily administer medication and it is the responsibility of the Commonwealth to provide the trial court with evidence that the hospital has complied. The Commonwealth failed to do so in this case and thus, we are constrained to affirm the trial court's denial of the Motion to Administer Medication Over Objection.

In sum, following our review, we conclude that the court properly concluded that the Commonwealth did not present sufficient evidence to allow the court to find that the Commonwealth satisfied the *Sell* factors. Further, because the Commonwealth provides no evidence that it sought involuntary medication pursuant to Pennsylvania's MHPA policy and procedures, we are constrained to affirm the trial court's order.

However, we are mindful that Appellee's behavior, treatment, and competency to stand trial may have changed over time and, thus, today's disposition is limited only to the resolution of the Commonwealth's January 9,

2025 motion and its February 24, 2025 motion to reconsider. Today's order is, accordingly, not subject to *res judicata*.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>01/14/2026</u>